Filed 2/28/23

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| PEMILADY ALGO-HEYRES et al., <br><br>   Plaintiffs and Respondents, <br><br> v. <br><br> OXNARD MANOR LP, <br><br>   Defendant and Appellant. | 2d Civil No. B319601 <br> (Super. Ct. No. 56-2020-00542015- <br> CU-NP-VTA) <br> (Ventura County) |

     An arbitration agreement, like any contract, requires the mutual consent of the parties. Here, we consider whether respondent Cornelio Heyres, a resident at Oxnard Manor, a skilled nursing facility, had the capacity to consent to arbitrate and waive his right to a jury trial on claims for medical malpractice, elder abuse, and related torts.

     The answer is no. Probate Code sections 810 through 812 provide that a party lacks legal capacity to enter into a contract where deficits in the person's mental functioning significantly impair the ability to understand and appreciate the attendant consequences, risks, and benefits of the contract. Because respondent lacked legal capacity to enter into a contract, his arbitration agreement cannot be enforced. The trial court denied

appellant Oxnard Manor's motion to compel arbitration for that reason. (Code Civ. Proc., § 1294, subd. (a).) We affirm.

FACTUAL AND PROCEDURAL HISTORY

Cornelio[1] suffered a stroke on August 18, 2009. He was hospitalized at St. John's Regional Medical Center for two weeks, followed by a month in St. John's inpatient rehabilitation facility. He entered Oxnard Manor, a skilled nursing facility, on October 3.

Four days later, on October 7, Cornelio signed an arbitration agreement. It stated that he gave up his right to a jury or court trial, and required arbitration of claims arising from services provided by Oxnard Manor, including claims of medical malpractice, elder abuse, and other torts.

Cornelio remained a resident at Oxnard Manor until his death nine years later. Respondents Pemilady Algo-Heyres and Wernher Heyres, individually and as Cornelio's successors in interest, sued Oxnard Manor for elder abuse/neglect, wrongful death, statutory violations/breach of resident rights, and negligent infliction of emotional distress.

Oxnard Manor filed a petition to compel arbitration. Both sides relied on medical records to demonstrate whether Cornelio had the mental capacity to consent to the arbitration agreement.

*St. John's records*

An occupational therapist assessed Cornelio's functional independence in the areas of comprehension, verbal/nonverbal expression, memory, and problem solving, and rated them as 1 (requires total assistance) on a 7-point scale. The assessment instrument noted that to "solve complex problems such as

_____

[1] We refer to Cornelio Heyres and Wernher Heyres by their first names for clarity. No disrespect is intended.

2

managing [a] checking account, self-administering meds" required a score of 6 or 7.

A physical therapy neurological evaluation stated Cornelio attempted to cooperate during treatment but did not follow verbal or visual cues. The report noted he had receptive and expressive communication barriers from aphasia.[2] He was rated as requiring "maximum assist" with problem solving.

A neurologist noted Cornelio "is nodding his head and seemingly understands the simple questions, but not . . . the complicated ones." He "follows the yes or no command" but "cannot perform the two-step commands and he rarely speaks more than two or three words."

Three weeks after the stroke, a speech language pathologist stated Cornelio's cognitive insight was "poor" and he required total assistance with executive function and problem solving. His overall progress was rated as "slow."

A month after the stroke, a neurologist noted Cornelio "spoke 1-2 words" and his comprehension had returned to about "70-80%." But he remained unable to follow two-step commands. A week later, the speech language pathologist noted Cornelio was "able to follow one-step directions" but required maximum verbal cues for "abstract, multiple step directions." He continued to require maximum assistance for executive functioning and problem solving.

On discharge from St. John's on October 2, the rehabilitation team concluded Cornelio required maximum

---

[2] "Aphasia" was defined as " 'a disorder that results from damage to portions of the brain that are responsible for language. . . . The disorder impairs the expression and understanding of language as well as reading and writing.' "

assistance with executive function and problem-solving skills.

*Oxnard Manor records*

A weekly summary prepared by a nurse at Oxnard Manor on October 7, the day the arbitration agreement was signed, checked boxes for "alert," "oriented," and "makes needs known."

Oxnard Manor also relied on forms from physical examinations performed by physicians on October 7, 2009, October 7 of either 2009 or 2011 (the handwritten date is unclear), and October 15, 2012. On each form, the physician checked a box indicating that Cornelio "has the capacity to understand and make decisions." The handwritten notes on these forms were partially illegible and included unexplained abbreviations. The trial court "place[d] little weight on [these] bare assertions" because Oxnard Manor provided no additional information to support them.

*Wernher's declaration*

Cornelio's son Wernher stated in his declaration that he spent several hours daily with his father shortly before and after the day the agreement was signed. [3] Oxnard Manor caregivers discussed Cornelio's condition with Wernher, not with Cornelio. Wernher made the decisions about his father's care because Cornelio did not appear to understand the questions.

Cornelio "struggled with the simplest of speech," "had difficulty remembering words," had difficulty understanding the speech of others, and would stare blankly in response to simple questions. "At his best, he would respond to simple yes/no questions, usually after they were repeated multiple times." He

---

[3] We consider the declaration even though the trial court's ruling did not cite it. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1268.)

4

did not appear to recognize family members, including his wife and his only granddaughter. "[H]is behavior and cognition appeared constant" during his first month at Oxnard Manor and neither improved nor deteriorated.

*Ruling*

The trial court denied Oxnard Manor's petition to compel arbitration. It reasoned that "it is more likely to be true than not true that at the time Cornelio is said to have signed the arbitration agreement he had a mental deficit that significantly impaired his ability to understand and appreciate the consequences of entering into the arbitration agreement. Therefore, it has not been established that he possessed the capacity to consent to arbitration."

DISCUSSION

" 'California has a strong public policy in favor of arbitration as an expeditious and cost-effective way of resolving disputes. [Citation.] Even so, parties can only be compelled to arbitrate when they have agreed to do so. [Citation.] . . . Whether an agreement to arbitrate exists is a threshold issue of contract formation and state contract law. [Citations.]' " (*Avila v. Southern California Specialty Care, Inc.* (2018) 20 Cal.App.5th 835, 843-844 (*Avila*).) "[S]tate law . . . specifically requires arbitration agreements to be *consensual* between the parties, because mutual consent is an essential ingredient of all contracts." (*Gallo v. Wood Ranch USA, Inc.* (2022) 81 Cal.App.5th 621, 638.)

On a petition to compel arbitration, "the trial court sits as a trier of fact." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.) Where an order denying arbitration is based on an issue of fact, we review the ruling for substantial

5

evidence.  (*Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1066.)  We likewise review for substantial evidence a finding regarding mental capacity.  (*In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 649 (*Greenway*).)  On appeal, we have no power to reweigh the evidence.  (*Fabian*, at p. 1067.)  We must resolve all conflicts in the evidence in favor of the prevailing party.  (*Ibid.*)  " '[W]e must "accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision . . . ." ' [Citations.]"  (*Holley v. Silverado Senior Living Management, Inc.* (2020) 53 Cal.App.5th 197, 202.)

Oxnard Manor contends the trial court erroneously placed the burden on it to show Cornelio had the capacity to enter the agreement.  We disagree.

As noted by the trial court, "The party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement."  (*Avila, supra*, 20 Cal.App.5th at p. 844.)  But the trial court also noted the "rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions."  (Prob. Code, § 810, subd. (a); *Wilson v. Sampson* (1949) 91 Cal.App.2d 453, 459.)

"A judicial determination that a person is totally without understanding, or is of unsound mind, or suffers from one or more mental deficits so substantial that, under the circumstances, the person should be deemed to lack the legal capacity to perform a specific act, should be based on evidence of a deficit in one or more of the person's mental functions."  (Prob. Code, § 810, subd. (c).)  As the trial court acknowledged, Probate Code section 811 requires that incapacity to contract be

6

supported by evidence of a deficit in at least one of four areas: alertness and attention, information processing, thought processes, and ability to modulate mood and affect. (Prob. Code, § 811, subd. (a).) The deficit must "significantly impair[] the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." (Prob. Code, § 811, subd. (b).) The capacity to make a decision requires the person have the ability to communicate the decision verbally or by other means, and to understand and appreciate the rights and responsibilities affected by the decision, the probable consequences, and the "significant risks, benefits, and reasonable alternatives involved in the decision." (Prob. Code, § 812.)

"[T]he determination of a person's mental capacity is fact specific, and the level of required mental capacity changes depending on the issue at hand . . . with marital capacity requiring the least amount of capacity, followed by testamentary capacity, and on the high end of the scale is the mental capacity required to enter contracts." (*Greenway*, *supra*, 217 Cal.App.4th at p. 639.) "More complicated decisions and transactions . . . require greater mental function." (*Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 730.) The agreement here was a relatively complex five-page document that included legal terms, referred to several statutes, and waived the constitutional right to trial.

While Probate Code sections 811 and 812 provide a "baseline" for capacity to contract, "Civil Code section 39, subdivision (b), provides more specific guidelines for determining the capacity to contract." (*Greenway*, *supra*, 217 Cal.App.4th at p. 642.) "A rebuttable presumption affecting the burden of proof that a person is of unsound mind shall exist for purposes of this

7

section if the person is substantially unable to manage his or her own financial resources or resist fraud or undue influence." (Civ. Code, § 39, subd. (b).) When this presumption applies, the party claiming capacity to contract has the burden "to prove that while he or she may be unable to manage his or her financial resources or resist fraud or undue influence, he or she is nevertheless still capable of contracting being of sound mind as defined by Probate Code section 811." (*Greenway*, at pp. 642-643.)

Evidence here that Cornelio scored below the level necessary to "solve complex problems such as managing [a] checking account" supports the conclusion that he was unable to manage his financial affairs. But regardless of whether the presumption of Civil Code section 39, subdivision (b) applied, substantial evidence established that Cornelio lacked the capacity to enter an arbitration agreement.

Medical professionals at St. John's concluded that Cornelio had deficits in receptive and expressive communication, memory, problem solving, following abstract directions, and executive functioning. Their reports showed deficits in mental functions pertaining to information processing, such as memory and the ability to plan, organize, and carry out actions (Prob. Code, § 811, subd. (a)(2)(A) & (F)). There was also a deficit in alertness and attention, including the ability to understand or communicate with others (*id.*, subd. (a)(2)(B)). Wernher's declaration additionally showed that Cornelio was unable to recognize familiar persons (*id.*, subd. (a)(2)(C)).

The trial court could reasonably infer from the evidence, including Cornelio's inability to recognize his wife or granddaughter, failure to respond to questions about his care, inability to understand speech, and ability to respond to only

8

simple questions or commands, that his deficits "significantly impair[ed]" his "ability to understand and appreciate the consequences" of waiving his right to trial.  (Prob. Code, §§ 811, subd. (b), 812.)  Because substantial evidence supported the trial court's finding that Cornelio was not competent to enter into an arbitration agreement, Oxnard Manor did not meet its burden to establish a valid agreement.

The trial court's ruling is consistent with *Smalley v. Baker* (1968) 262 Cal.App.2d 824, upon which Oxnard Manor relies.  *Smalley* was decided before the enactment of Probate Code sections 810 through 812, and was based on Civil Code sections 38 and 39.  It held that "a party is entitled to rescission of a contract if, when he entered into the contract, he was not mentally competent to deal with the subject before him with a full understanding of his rights, the test being, in each instance, whether he understood the nature, purpose and effect of what he did." (*Smalley*, at p. 832.)  *Smalley* reviewed for substantial evidence the trial court's finding that he lacked "the requisite mental capacity to enter into a contract."  (*Ibid.*)  As discussed above, substantial evidence here supports the trial court's finding that Cornelio lacked the capacity to consent to arbitration.

Finally, we conclude the trial court acted within its authority as a finder of fact when it credited the St. John's reports and gave "little weight on the bare assertions that Cornelio had the capacity to understand and make decisions." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)  The trial court found medical notes from Oxnard Manor to be "nearly illegible," and noted that no expert declaration was submitted to interpret them.  It weighed the evidence and found "[t]he more persuasive and compelling

9

evidence is that prior to his admission into defendants' facility, Cornelio had a substantial cognitive deficit and, although he was improving, he was progressing slowly. There is no credible evidence supporting the abrupt improvement in his condition that defendants urge the court to find." This is substantial evidence that Cornelio lacked capacity to enter into the arbitration agreement.

## DISPOSITION

The order denying appellant's petition to compel arbitration is affirmed. Respondents shall be awarded costs on appeal.

CERTIFIED FOR PUBLICATION.

BALTODANO, J.

We concur:

GILBERT, P. J.

YEGAN, J.

10

Mark S. Borrell, Judge

Superior Court County of Ventura

_____

Zarmi Law and David Zarmi for Defendant and Appellant.
Francis Law and Glenna M. Francis for Plaintiffs and Respondents.